**SO ORDERED.**

**SIGNED this 22 day of April, 2015.**

_____
Stephani W. Humrickhouse
United States Bankruptcy Judge

_____

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NORTH CAROLINA
WILMINGTON DIVISION

| | |
|---|---|
| IN RE: | CASE NO. |
| BRITT MOTORSPORTS, LLC | 11-07688-8-SWH |
| DEBTOR | |
| | |
| JAMES B. ANGELL, TRUSTEE | ADVERSARY PROCEEDING NO. |
| Plaintiff | 14-00058-8-SWH-AP |
| v. | |
| HYOSUNG MOTORS AMERICA, INC. | |
| Defendant. | |

1

**ORDER GRANTING MOTION FOR SUMMARY JUDGMENT**

This matter is before the court on the motion for summary judgment filed by James B. Angell, chapter 7 trustee (the "trustee") in the debtor's bankruptcy case. A hearing was held in Raleigh, North Carolina on February 3, 2015.

**BACKGROUND**

Britt Motorsports, LLC (the "debtor"), filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code on October 7, 2011. Prior to filing its bankruptcy petition, the debtor, who was in the business of selling used motorcycles, ATV's, watercraft and custom metric motorcycles, had a business relationship with Hyosung Motors America, Inc. ("Hyosung"), which provided motorcycles to the debtor for sale to retail customers. Between August 18, 2011, and October 30, 2012, Hyosung and the debtor entered into at least five "Dealer Payment Agreements/Promissory Notes" (collectively, the "Britt Notes"), pursuant to which Hyosung delivered motorcycles to the debtor, which the debtor would sell to retail customers and then pay Hyosung in full. Hyosung retained title to the motorcycles until the units were sold and it received payment, at which time Hyosung would release the Manufacturer's Statement of Origin ("MSO") for the particular units directly to the retail customers. Hyosung also reserved the right to pick up unsold units at any time. In accordance with the Britt Notes, the debtor made multiple post-petition payments to Hyosung between February 2012 and November 2012 totaling at least $85,742.68.

On February 13, 2014, the debtor's chapter 11 case was converted to one under chapter 7 and a trustee was appointed. The trustee initiated this adversary proceeding on February 21,

2014, seeking avoidance of the post-petition transfers made to Hyosung pursuant to 11 U.S.C. § 549 and the recovery of these transfers pursuant to § 550(a)(1). The trustee filed a motion for summary judgment on December 15, 2014, and Hyosung filed a response on January 5, 2015.

The trustee contends that the payments made to Hyosung were property of the estate under §§ 541(a)(1) and (a)(7), and thus constituted post-petition transfers prohibited by § 549. The trustee maintains that, although under § 1108 a chapter 11 debtor-in-possession is generally permitted to continue operating its business, such operations remain subject to the Code's preconditions for obtaining credit and incurring debt post-petition. See § 364. The trustee contends that the transactions between the debtor and Hyosung were in fact post-petition financing arrangements which were prohibited because the debtor did not obtain authorization from the bankruptcy court.

Hyosung disputes the claim that these transactions were post-petition financing arrangements and contends that summary judgment is improper. Hyosung asserts that its relationship with the debtor under the Britt Notes was one of consignment. Further, Hyosung contends that the payments of funds from the debtor after the commencement of its chapter 11 case were authorized under § 1108, and that the consignment transactions were a continuation of the parties' pre-petition business transactions in the debtor's ordinary course of business. Thus, Hyosung asserts that no formal order authorizing the debtor to operate its business in this manner was necessary.

## DISCUSSION

"[S]ummary judgment is proper 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'" Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).  Where the nonmoving party bears the burden of proof on a dispositive issue, it must "go beyond the pleadings and by [its] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" Id. at 324.  In making this determination, conflicts are resolved by viewing all facts and inferences to be drawn from the facts in the light most favorable to the non-moving party.  United States v. Diebold, Inc., 369 U.S. 654, 655 (1962) (per curiam).  Summary judgment should not be granted "unless the moving party has established his right to a judgment with such clarity as to leave no room for controversy." Portis v. Fold Constr. Co., 694 F.2d 520, 522 (8th Cir. 1982) (internal quotations omitted).

Section 549(a) of the Code allows the trustee to avoid a transfer of property of the estate that occurs after the commencement of the case that is not authorized under Title 11 or by the bankruptcy court.  Upon commencing a chapter 11 case, a debtor-in-possession is permitted to continue operating its business under § 1108, but it remains subject to the Code's preconditions for obtaining credit and incurring debt post-petition.  §§ 364(a), (b).  A debtor-in-possession may incur unsecured debt in the ordinary course of business, but it may not incur secured debt without court approval.  See §§ 364(a), (b).  If a transfer is found to be avoidable, § 550(a)

allows the trustee to recover for the benefit of the estate the property transferred, or, if the court so orders, the value of such property from the initial transferee. § 550(a). The defendant has the burden of proof as to the validity of the transfers. Fed. R. Bankr. P. 6001.

Both parties agree that the transfers at issue, the payments to Hyosung, occurred after the commencement of the debtor's bankruptcy case, and that authorization from the court was not sought or obtained. They disagree as to whether authority for the transfers was necessary. If the payments were for unsecured debt incurred in the ordinary course of the debtor's business, no specific authorization from the bankruptcy court was necessary and they were not prohibited by § 549. If, on the other hand, the payments arose out of secured transactions, authorization was required, and in absence of such authorization, the transfers were prohibited under § 549. Thus, the court must first determine whether the arrangements were consignments or secured transactions. If they were secured transactions, they were prohibited by § 549. However, if they were consignments, the court must determine whether they were in the ordinary course of business. The court must first look to the contract[1] at issue:

> I, D. Scott Britt, principal of Hotrodz of Fayetteville LLC, d/b/a Hotrodz of Fayetteville located at 3618 Sycamore Dairy Road Fayetteville, NC 28303 promises to pay Hyosung Motors America Inc. at 5815 Brook Hollow Parkway Suite C Norcross, GA 30071 in the sum of Twenty Eight Thousand Six Hundred and Sixty Dollars ($38,880.00) [sic] for 12 units purchased under invoice no.

---

[1]Hyosung and the debtor entered into five separate Dealer Payment Agreements/Promissory Notes, each of which varied as to payment amount and number of units. The court quotes from the Note dated October 30, 2012. Although the majority of the Britt Notes contain terms identical to the October 30, 2012 Note, there are variations. The Notes dated March 21, 2012 and April 24, 2012 do not reserve Hyosung's right to pick up unpaid units at any time, and the Note dated August 18, 2011 states the number of "units," rather than "units *purchased*."

> 68801. Hotrodz of Fayetteville will pay 10% down payment (+ full freight/handling) in amount of $4,230.00 to release units and will pay (4) monthly installments of $8,662.50, starting 90 days after the release of the units. . . .
>
> Hotrodz of Fayetteville must notify Hyosung Motors America of sold units immediately and make payment within 2 working days from sold date. . . . Hyosung Motors America will release MSO upon receipt of payment.
>
> In event of default in payment amount under this promissory note, 1.5% interest per month will apply based on principal balance.
>
> All the payments are required to be made hereunder shall be made by Hotrodz of Fayetteville without any right to set off or counter claim. . . .
>
> Dealer must submit to and cooperate with any inventory inspections, whether by dealership visit, phone call, or e-mail request. Hyosung Motors America, Inc. reserves the right to pick-up [sic] any unpaid units at anytime and charge dealer for any damages or missing parts on vehicles.

The Britt Notes contained promises by the debtor to pay Hyosung for certain numbers of "units" or "units purchased," and required the debtor to make an initial down payment of approximately ten percent of the purchase price, followed by monthly installments. In the event that the debtor were to default in payment under any of the Britt Notes, interest at the rate of 1.5% per month was to apply to the principal balance under the particular Note. The Britt Notes required the debtor to pay the outstanding balance to Hyosung within two working days if a unit was sold. Furthermore, in several of the Britt Notes, Hyosung reserved the right not only to pick up unpaid units at any time and charge the debtor for any damages or missing parts, but also to engage in inventory inspections. Additionally, Hyosung mailed invoices to the debtor indicating the amounts due. The terms of the Britt Notes are summarized as follows:

| Date of Note | Amount of Note | Number of Units | Payment Terms |
| --- | --- | --- | --- |
| 08/18/2011 | $14,009.00 | 5 | $1,400.90 down, $2,521.62 monthly |
| 03/21/2012 | $23,060.00 | 8 | $2,360.00 down, $5,175.00 monthly |
| 04/24/2012 | $15,270.00 | 6 | $1,690.00 down, $3,395.00 monthly |
| 05/29/2012 | $28,660.00 | 8 | $3,100.00 down, $6,390.00 monthly |
| 10/30/2012 | $38,880.00 | 12 | $4,230.00 down, $8,662.50 monthly |

"Consignment" is defined under Article 9 of the Uniform Commercial Code as follows:

"Consignment" means a transaction, regardless of its form, in which a person delivers goods to a merchant for the purpose of sale and:
    a. The merchant:
        1. Deals in goods of that kind under a name other than the name of the person making delivery;
        2. Is not an auctioneer; and
        3. Is not generally known by its creditors to be substantially engaged in selling the goods of others;
    b. With respect to each delivery, the aggregate value of the goods is one thousand dollars ($1,000) or more at the time of delivery;
    c. The goods are not consumer goods immediately before delivery; and
    d. The transaction *does not create a security interest that secures an obligation*.

N.C. Gen. Stat. § 25-9-102 (emphasis added). At issue is whether the transaction constitutes a "true consignment" or a "secured transaction," which in turn depends on the intent of the parties at the time of contract formation. In re Oriental Rug Warehouse Club, Inc., 205 B.R. 407, 410 (Bankr. D. Minn. 1997) (citing In re Ide Jewelry Co. Inc, 75 B.R. 969, 977 (Bankr. S.D.N.Y. 1987)). Intent is determined objectively by examining the "economic realities of the

transaction" rather than the subjective intent of the parties.  Id.  If a conflict arises as to whether a transaction is a true consignment or a secured transaction, the acts of the parties prevail over their designation of the relationship.  In re Lexington Appliance Co., 202 F. Supp. 869, 871 (D. Md. 1962).

The court in In re Oriental examined various factors to be employed in objectively determining whether an agreement is a true consignment.  Factors indicating that a consignment agreement was actually intended to be a secured financing agreement include:

> 1.  The setting of the resale price by the consignee;
> 2.  Billing the consignee upon shipment;
> 3.  Commingling the proceeds and failure to keep proper accounts by the consignee; and
> 4.  Mixing consigned goods with goods owned by the consignee.

205 B.R. at 410 (citing In re Ide Jewelry Co., 75 B.R. at 978).  Factors indicating that the parties intended a true consignment include:

> 1. Consignor retained control over the resale price of the consigned property;
> 2. Consignee was given possession with authority to sell only upon consent of the consignor;
> 3. Consignor may recall the goods;
> 4. Consignee was to receive a commission and not a profit on the sale;
> 5. Consigned property was segregated from other property of the consignee;
> 6. Consignor was entitled to inspect sales records and the physical inventory of the goods in the consignee's possession; and
> 7. Consignee has no obligation to pay for the goods unless they are sold.

Id. at 410-411 (citing In re Ide Jewelry Co., 75 B.R. at 978).  In In re Oriental, 205 B.R. at 411, the court found that the transaction at issue created a security interest rather than a consignment because it was undisputed that the debtor: (1) set its own prices; (2) was billed upon shipment,

not upon sale; (3) commingled proceeds from the allegedly consigned property with that of its own; and (4) received a profit upon sale rather than on a commission.

Several courts have identified the presence of an obligation to purchase or pay for the goods as the most important factor in determining whether an agreement is a true consignment. See Reliance Shoe Co. v. Manly, 25 F.2d 381, 383 (4th Cir. 1928); In re Lexington Appliance Co., 202 F. Supp. at 871; In re Phippens v. Caldwell, 4 B.R. 155, 157 (Bankr. M.D. Tenn. 1980). "[I]f the alleged consignee is absolutely bound in all events to pay for the goods unsold, even though title is reserved in the alleged consignor, the transaction is a sale, or at least a conditional sale." In re Lexington Appliance Co., 202 F. Supp. at 871. In In re Phippens v. Caldwell, 4 B.R. at 158, the court found that the debtor had an absolute obligation to pay for the goods because any return of the goods required the debtor to pay the difference between the amount of the draft held by the alleged consignor and the amount realized from a subsequent sale. Additional factors indicating the secured nature of the transaction were that the debtor commingled his own goods with those of the alleged consignor, the debtor had complete control over the prices assigned to the goods, and the debtor paid the alleged consignor a set amount per week for a period of time which was not credited to the purchase price of any good. Id. In In re Georgetown Steel Co., LLC, 318 B.R. 352, 360 (Bankr. D.S.C. 2004), the court found that the agreement in question did not create a security interest because the debtor had no duty to pay for unsold goods; rather, it was "clear that Debtor only owed [the consignor] a debt for the goods it consumed." Furthermore, in In re Georgetown Steel, the court noted that the plain language of

the parties' agreement was replete with language indicating its consignment status: the agreement was labeled "Consignment Agreement," it referred to the goods as "Consigned Goods," and it referred to the debtor and consignor as "Consignee" and "Consignor." 318 B.R. 362.

In the matter at hand, two factors lean in favor of a finding that the transactions were on consignment: (1) Hyosung retained the right to pick up unsold motorcycles at any time; and (2) the debtor was required to submit to and cooperate with any inventory inspections requested by Hyosung. Factors which support a finding that the transactions were secured financing arrangements are: (1) the debtor was obligated to pay for the goods by virtue of the ten percent down payment, the monthly installments and the requirement that the debtor remit funds to Hyosung within two days of ultimate retail sale; (2) the debtor was billed upon shipment of the goods rather than upon sale and was also responsible for freight and handling; (3) the debtor apparently set its own prices for retail sale; (4) the debtor received a profit from sales of the motorcycles rather than a commission; and (5) the debtor did not have to seek Hyosung's authorization prior to selling a unit. The court also notes that the Britt Notes were labeled "Dealer Payment Agreement/Promissory Note," and four of the Britt Notes referred to the promise to pay as being in exchange for "units *purchased*," both of which further evidence an obligation to pay. Additionally, the Britt Notes provided for interest to be applied in the "event of default in payment," and state, without qualification, that "[a]ll the payments are required to be made hereunder . . . without any right to setoff or counterclaim."

Hyosung offered the affidavit of Ko Hyon, a regional sales manager of Hyosung, to support its argument that summary judgment should be denied. However, Hyon's affidavit stated simply that the parties understood the agreements to be on consignment, and that the agreements were standard in the industry. What the parties subjectively understood the agreements to be is not relevant, as the determination is made based on objective intent. This is insufficient to create a genuine dispute of material fact as to whether the transactions were consignments or financing arrangements.

It appears on balance to the court that the objective characteristics of the relationship between the debtor and Hyosung indicate that the parties were actually operating under secured transaction arrangements rather than true consignments. Hyosung has not presented any facts that might demonstrate any genuine issue of material fact. The Britt Notes are clear in that they establish obligations for the debtor to pay for the units, and the factors indicate that the transactions were secured financing arrangements rather than consignments. As such, they were prohibited by § 549 because they were done without authorization from the court.

Accordingly, the trustee's motion for summary judgment is **GRANTED**. A separate judgment will be entered accordingly.

**END OF DOCUMENT**